UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:  Michael J. Poivey and Denise P. Poivey,          Chapter 7

Debtors.          Case No. 17-26408-bhl

## DECISION

Long before she filed for bankruptcy, debtor Denise P. Poivey inherited mineral rights (Mineral Rights) located in Texas. The court must now decide whether those Mineral Rights are excluded from her bankruptcy estate under 11 U.S.C. §541(b)(4), a somewhat obscure provision in the Bankruptcy Code that excepts from the estate certain interests in "liquid or gaseous hydrocarbons." The parties offered evidence and argument on this issue at a December 12, 2017 hearing. The court took the matter under advisement and now concludes that section 541(b)(4) does not apply to the Mineral Rights, which are, therefore, property of the estate.

## BACKGROUND

### A. Procedural History

Denise Poivey and her husband Michael filed a chapter 7 petition jointly on June 28, 2017. The Poiveys identified "Mineral Rights" with a value of $24,350 as assets on Schedule A/B. They sought to exempt the entire value of those Mineral Rights, invoking their section 522(d)(5) "wildcard" exemption rights, on Schedule C.

A few months later, after questioning the Poiveys at the section 341 meeting of creditors, the chapter 7 trustee objected to the Poiveys' claimed exemption of the Mineral Rights. The trustee argued that the Mineral Rights were more valuable than the Poiveys' $24,350 estimate and any value in excess of the exemption amount should be administered and paid to unsecured creditors.

At an October 3, 2017 hearing on the trustee's objection, the Poiveys defended their

exemption and raised a new issue.  The Poiveys claimed that, exemption issues aside, the Mineral Rights were excluded from their bankruptcy estate altogether under section 541(b)(4)(A) and (B).  While acknowledging that additional documents and information were needed to complete their analysis, the Poiveys argued that the Mineral Rights could be the type of interest in liquid or gaseous hydrocarbons excluded from the estate by the statute.

Within weeks of the Poiveys' raising the issue, the trustee made two filings related to the Mineral Rights.  On October 10, 2017, the trustee moved to require the debtors to turn over documents and post-petition royalty checks related to the Mineral Rights.  A week later, on October 17, 2017, the trustee asked for court approval to sell the Mineral Rights "free and clear" under 11 U.S.C. §363(b) and (f).  The Poiveys objected to both motions, arguing: (1) the Mineral Rights were not property of the estate under section 541(b)(4)(A) and (B); and (2) even if the Mineral Rights were property of the estate, the Poiveys had properly exempted them.

The court set a December 12, 2017 hearing to resolve whether section 541(b)(4)(A) or (B) excluded the Mineral Rights from the estate.  The court allowed the parties to present live video testimony from three witnesses at locations in Texas and North Carolina.  After the arrangements for videoconferencing were made, this case was reassigned from Judge Kelley to this court, which conducted the December 12 hearing.

### B.  Denise Poivey's Interest in the Mineral Rights

Denise Poivey's ownership of the Mineral Rights arises from her grandfather's purchase of land in Wheeler County, Texas in the 1960s.  At some point in the 1970s, Denise Poivey inherited an interest in these Mineral Rights.  The exact nature of Poivey's inheritance is not clear from the record, but it appears that she, along with her siblings, inherited a portion of her grandfather's Texas landholdings, which were by then already subject to agreements or leases for oil and gas development.

The Wheeler County land has been the subject of at least two oil and gas leases.  The first lease, dated July 10, 1969, (the 1969 Lease) appears to precede Denise Poivey's inheritance.

Helen Marie Farren Davis, who may have been Denise Poivey's grandmother, signed the 1969 Lease, granting oil and development rights to Malouf Abraham as lessee. The second lease, dated October 3, 1975, (the 1975 Lease) is signed by Denise Poivey herself (then known as Denise P. Farren), along with her mother, Martha Farren, and several of Denise Poivey's siblings. The lessee is the Malouf Abraham Company. Both leases identify the same real property and it seems likely that the second lease replaced the first one, perhaps after the termination of the first lease or the transfer of the property through inheritance. Because the parties focused their attention on the 1975 lease, the court will as well.

Through the 1975 Lease, Denise Poivey (and the other lessors) conveyed to the lessee the exclusive right to investigate and produce oil, gas and other minerals on approximately 2,110.5 acres of land located in Wheeler County, Texas. (1975 Lease ¶1.) Among other terms:

- The lease has a five-year "primary term" and remains in force "as long thereafter as oil, gas, or other mineral is produced" from the land. (*Id.* ¶2.)
- The lessee agreed to pay consideration to the lessors of ten dollars, plus royalties equal to one-eighth of the value of any oil or liquid hydrocarbons or gas produced from wells on the land. (*Id.* ¶3.)
- If the lessee did not commence drilling or mining operations within the first year, the lease would automatically "terminate as to both parties" unless the lessee made a $2,110.50 payment. (*Id.* ¶4.)
- Even if production stops, the lessee or its assignees can avoid termination by reworking dry wells or starting additional drilling operations within prescribed time periods. (*Id.* ¶6.)

Over the past decades and continuing through their bankruptcy filing, the Poiveys have received royalty payments under the 1975 Lease. According to the Poiveys, over the last six months, the royalty payments have averaged $2,159.56 per month.

# ANALYSIS

The Poiveys invoke section 541(b)(4)(A) and (B) in their effort to exclude the Mineral Rights from their estate. Section 541(b)(4)(A) provides for the exclusion of certain hydrocarbon interests involving "farmout agreements." Section 541(b)(4)(B) excludes hydrocarbon interests involving written conveyances of "production payments." The Poiveys have not shown that either subsection applies to the Mineral Rights.

### A. Section 541(b)(4)(A) Does Not Exclude the Mineral Rights from the Estate.

The Poiveys' primary argument for excluding the Mineral Rights from their bankruptcy estate rests on section 541(b)(4)(A). This provision excludes from the estate, a debtor's interest in any "liquid or gaseous hydrocarbons" to the extent that:

> (i) the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and
>
> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title[.]

11 U.S.C. §541(b)(4)(A).

For this provision to apply, the Poiveys must show three things. First, they must prove the existence of a "farmout agreement" or an agreement directly related to a farmout agreement. Second, they must show that Denise Poivey has transferred or agreed to transfer her interest in liquid or gaseous hydrocarbons pursuant to that farmout agreement. Third, they must show that "but for" section 541(b)(4)(A), the estate could include the interest in liquid or gaseous hydrocarbons in the estate *only* by virtue of section 365 or section 544(a)(3). *See* 5 Collier on Bankruptcy ¶541.20 (Richard Levin and Henry J. Sommer eds., 16th ed. 2017).

### 1. Is the 1975 Lease a Farmout Agreement or an Agreement Directly Related to a Farmout Agreement?

Both the Poiveys and the trustee devote the bulk of their energy to arguing over whether the 1975 Lease is a farmout agreement. Citing to the Bankruptcy Code's definition of the term,

the Poiveys maintain that the 1975 Lease is a farmout agreement. According to 11 U.S.C. §101(21A), the term "farmout agreement" means a written agreement in which:

> (A) the owner of a right to drill, produce, or operate liquid or gaseous hydrocarbons on property agrees or has agreed to transfer or assign all or a part of such right to another entity; and
>
> (B) such other entity (either directly or through its agents or its assigns), as consideration, agrees to perform drilling, reworking, recompleting, testing, or similar or related operations, to develop or produce liquid or gaseous hydrocarbons on the property.

11 U.S.C. §101(21A). The Poiveys insist that the 1975 Lease falls within this broad definition.

The trustee disagrees. He argues that the 1975 Lease is not a farmout agreement, but rather an oil and gas lease, and these are understood to be two very different things in the oil and gas industry and under Texas law.[1]

Texas case law and secondary sources confirm that oil and gas leases and farmout agreements are different documents used to accomplish different ends. Real property owners use oil and gas leases to transfer to a developer the right to explore for and produce oil and gas, while otherwise retaining title to the real property. This allows underground oil and gas to be developed efficiently: a property owner can sell the rights to the underground hydrocarbons without having to have the expertise to exploit them, and an oil and gas developer can acquire the development rights without having to purchase the entirety of the real estate. Nancy Saint-Paul, Summers Oil and Gas §9:1 (3d ed. 2017 update). Although called a "lease," the lessor conveys title to the underground oil and gas to the lessee under Texas law. Upon execution and

---

[1] Both parties attempt to rely on "expert" testimony to support their arguments on whether the 1975 Lease is a farmout agreement. The debtors seek to introduce testimony from Christopher H. Killion, a Texas lawyer with experience in oil and gas matters. Likewise, the trustee relies upon testimony from John R. Bonica, another Texas oil and gas attorney. Both sides fail to appreciate the limits of "expert" testimony. Other than Federal Rule of Civil Procedure 44.1, which creates an exception for expert testimony on questions of *foreign* law, expert testimony is not admissible on the meaning of the applicable law. *Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (noting "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"). It is the court's job to interpret and apply the law. *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495 (7th Cir. 2009) (explaining that "judges are experts on law"). Expert testimony is admissible only to assist the trier of fact. Fed. R. Evid. 702. At best, the statements of Killion and Bonica are legal arguments made to support each side's position on how the court should interpret sections 541(b)(4) and 101(21A). Accordingly, the court will treat both witnesses' "testimony" as additional argument, not admissible evidence.

delivery, the lease operates "as a present conveyance of the oil and gas under the premises described in the lease, and vest[s] in [the lessee] a determinable fee in the oil and gas in place." *Jones v. Bevier*, 59 S.W.2d 945, 948 (Tex. Civ. App. 1933) (citing *Texas Co. v. Davis*, 254 S.W. 304 (Tex. 1923); *see also Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991) ("In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee."). The lessor retains the other beneficial uses of the land, and typically continues to hold both a royalty interest in the underlying minerals and a reversionary interest in those minerals, should the lease terminate. Summers Oil and Gas §9:1.

In contrast, farmout agreements are generally used by oil and gas operators, not property owners. An operator enters into a farmout agreement to assign its development rights under an oil and gas lease to another producer, often when the lease nears expiration. Summers Oil and Gas §28:14. Through the assignment, the lessee can avoid the potential for having its lease rights terminated for lack of exploration or production by "farming out" those obligations to the assignee, also called a "farmee." *Id.* Farmout agreements have at least two significant attributes. First, the assignee under a farmout agreement typically takes title to the underlying gas and oil only after it completes drilling. The "primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the acreage as a prerequisite to completion of the transfer." *Young Refining Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 389 (Tex. Ct. App. 2001) (*citing* 8 Williams and Meyers, Oil and Gas Law, Manual of Terms 389 (9th ed. 1994)) (emphasis omitted). Thus, the assignee under a farmout agreement may expend substantial resources towards completing performance, and still not have title to the underlying minerals because its work is not completed. Second, farmout agreements are often not recorded. No matter how much progress the assignee has devoted toward "earning" the value of the underground gas and oil, title in the oil and gas remains with the assignor until the assignee completes its contractual obligations. *See* Mitchell E. Ayer, 34 Energy & Mineral L. Found. §7.06 (2013).

The case law and secondary sources thus appear to confirm the trustee's position that oil and gas leases and farmout agreements are very different things. The Poiveys make a compelling argument, however, that the Code's definition of farmout agreement is written so broadly that it encompasses the 1975 Lease. Walking through the elements in section 101(21A)'s definition of a farmout agreement, the Poiveys contend that the 1975 Lease is: (1) a written agreement, (2) through which Denise Poivey and the other lessors agreed to transfer all or a portion of the right to drill and produce liquid or gaseous hydrocarbons on the Wheeler County property to Malouf Abraham Company, and (3) part of the consideration for that transfer was Malouf Abraham Company's agreement to perform drilling to develop and produce liquid or gaseous hydrocarbons on the property. The Poiveys maintain that the 1975 Lease falls within section 101(21A)'s definition and must be treated as a farmout agreement for bankruptcy purposes, even if Texas law and secondary sources would never consider an oil or gas lease to be one outside of bankruptcy.

To avoid section 101(21A)'s definition, the trustee urges the court to find that the 1975 Lease is not a "written agreement." The trustee insists that because Texas law treats an oil and gas lease as a conveyance of mineral rights, the 1975 Lease cannot be a written agreement. The trustee's argument is not persuasive because it assumes that a written agreement and a conveyance are mutually exclusive. They are not. *See* 54A Am. Jur. 2d *Mortgages* §97 (2017 update) ("an absolute conveyance of land [may be] based upon or accompanied by a written agreement"). And, indeed, by its plain terms, the 1975 Lease both conveys rights in the underground oil and gas to the lessee *and* lists several undertakings "agreed to" by the parties. For example, in describing the consideration to be paid the lessors, the 1975 Lease lists money, royalties, and "the agreements of the lessee herein contained." (1975 Lease ¶1.). In sum, the 1975 Lease is both a written agreement and a conveyance.

If the 1975 Lease is a written agreement, does this mean that it is a farmout agreement under the Code's definition, even if no one in the industry would ever confuse an oil and gas lease for a farmout agreement? In other words, did Congress intend for something that would

not be considered a "farmout agreement" in the oil and gas industry to be one for purposes of the Bankruptcy Code? This seems a very odd, perhaps even absurd, result. Fortunately, the court does not need to resolve this question, because even if the 1975 Lease is considered a farmout agreement, the Poiveys have not carried their burden on one of the other two statutory elements.[2]

### 2. Does the Estate's Interest in the Mineral Rights Arise Solely Because of Section 365 or Section 544(a)(3)?

There is no dispute that Denise Poivey and the other lessors transferred an interest in liquid or gaseous hydrocarbons pursuant to the 1975 Lease. This is the second element of a section 541(b)(4)(A) exclusion. Thus, if the 1975 Lease is a farmout agreement, the Poiveys will have carried their burden on the first two elements of section 541(b)(4)(A). But the Poivey's have not carried their burden on the third statutory element – they have not shown that the estate could include Denise Poivey's interest in the Mineral Rights "only by virtue of" either section 365 or section 544(a)(3). This failure is fatal to their attempt to exclude the Mineral Rights from the estate under section 541(b)(4)(A).

Section 541(b)(4)(A)'s citation to sections 365 and 544(a)(3) is central to understanding the purpose of the statutory exclusion. Section 365 gives the trustee the power to assume or reject the debtor's executory contracts or unexpired leases, subject to court approval. 11 U.S.C. §365(a); *Matter of Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 380 (7th Cir. 1983). Section 544(a)(3) gives the trustee the power to avoid transfers of property by the debtor to the extent a bona fide purchaser of real property could avoid such transfers. *In re Crane*, 742 F.3d 702, 706 (7th Cir. 2013) ("State law governs who would count as a bona fide purchaser and what constitutes constructive notice sufficient to defeat a bankruptcy trustee's section 544(a)(3) power."). Section 541(b)(4)(A) is sometimes called the farmout agreement "safe harbor" provision because it protects parties to a farmout agreement from being unfairly stripped of

---

[2] Because, as discussed below, the court concludes that even if the 1975 Lease is a farmout agreement, the Poiveys have not satisfied the third requirement for invoking section 541(b)(4)(A), the court will not address the Poivey's alternate argument that the 1975 Lease is a "written agreement directly related to a farmout agreement." Even if it is such an agreement, the Poiveys cannot satisfy the third element and thus cannot prevail.

valuable rights by a trustee's application of section 365 or section 544(a)(3).   The legislative history confirms that this is indeed the purpose of the provision.   H.R. Rep. No. 102-474(VII), 9-10 (1992), as reprinted in 1992 U.S.C.C.A.N. 2271, 2278.

With respect to the executory contract provisions in section 365, an assignee under a farmout agreement is protected from the potentially unfair termination of a not-yet-completed farmout.   An assignee under a farmout agreement generally does not take title to the underground oil and gas until the required drilling and production obligations are completed. *See Young Refining Corp.*, 46 S.W.3d at 389.   Consequently, if the assignor under a farmout agreement files for bankruptcy, the assignee would be at risk of the trustee invoking section 365 to reject the still executory contract.   By rejecting the executory contract, the trustee would cause the estate to include the as-yet-undeveloped oil and gas, which the assignee may have already expended substantial resources developing.

With respect to the trustee's lien avoidance powers under section 544(a)(3), an assignee of an unrecorded farmout agreement is protected from the possibility of having its rights wiped out by the trustee's lien avoidance powers.   Farmout agreements are often not recorded. Summers Oil & Gas §28:14.   As a result, the assignee's rights in any underground oil and gas under a farmout agreement might be subject to avoidance by the trustee under section 544(a)(3). By carving these rights from property of the estate, where the estate's interest arises solely because of the trustee's lien avoidance power in section 544(a)(3), the assignee's potentially significant investments under an unrecorded farmout agreement are protected.

The Poiveys' invocation of section 541(b)(4) fails because the trustee is not attempting to pull the Mineral Rights back into the estate through the use of his section 365 executory contract powers or his lien avoidance powers under section 544(a)(3).   While the court does not have full details of all of Denise Poivey's pre-bankruptcy ownership interests in the Mineral Rights, the record is clear that, pursuant to the 1975 Lease, she retained both a royalty interest in the underground oil and gas and a reversionary interest should the current lessor ever stop production.   These interests passed to the bankruptcy estate when she and her husband filed

their joint Chapter 7 petition on June 28, 2017. Thus, the estate's interest in the Mineral Rights does not result solely (or even partially) by virtue of section 365 or section 544(a)(3).

The Poiveys misread the statute in arguing that the third element is satisfied merely because the 1975 Lease is an executory contract. The statute does not apply simply because an executory contract is involved or because a farmout agreement is not recorded. Section 541(b)(4)(A) requires that the estate's interest in the liquid or gaseous hydrocarbons must arise "only by virtue of" section 365 or section 544(a)(3). The mere existence of an executory contract or an unrecorded interest is not sufficient to exclude the Mineral Rights from the Poiveys' bankruptcy estate.

### B. Section 541(b)(4)(B) Does Not Exclude the Mineral Rights from the Estate.

With much less vigor and detail, the Poiveys alternatively argue that section 541(b)(4)(B) excludes the Mineral Rights from the estate. If the 1975 Lease is not a farmout agreement, the Poiveys assert, then the Mineral Rights should be excluded because the 1975 Lease is a "written conveyance of a production payment" under section 541(b)(4)(B). Block quoting large sections of the 1975 Lease, the Poiveys contend that because the royalty payments made to Denise Poivey and the other lessors are based on the production of oil or gas from wells on the Wheeler County property, the 1975 Lease is a production payment agreement. This argument is not well developed. It is also fails based on the plain language of the statute.

Section 541(b)(4)(B) excludes from a bankrupt debtor's estate any "interests of the debtor in liquid or gaseous hydrocarbons" to the extent that:

> (i) the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and

> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title.

11 U.S.C. §541(b)(4)(B).

The term "Production Payment" is defined in section 101(42A) as:

a term overriding royalty[3] satisfiable in cash or in kind –

(A) contingent on the production of a liquid or gaseous hydrocarbon from particular real property; and

(B) from a specified volume, or a specified value, from the liquid or gaseous hydrocarbon produced from such property, and determined without regard to production costs.

11 U.S.C. §101(42A).

The Poiveys' invocation of section 541(b)(4)(B) fails foremost because they have not shown that the 1975 Lease is a written conveyance of a production payment. The record shows that Denise Poivey and the other lessors transferred interests in the underground oil and gas on the Wheeler County property to the lessee, Malouf Abraham Company, pursuant to the 1975 Lease. The interests that the trustee claims as property of the estate, however, are interests that Denise Poivey *retained* after the 1975 Lease – for example, her royalty interest in the underground oil and gas. Section 541(b)(4)(B) applies to interests that were transferred, not those retained. Accordingly, the Poiveys' invocation of section 541(b)(4)(B) is misplaced.

Moreover, the statute requires that the transfer have been made to an entity that does not participate in the operation of the property. Here, Denise Poivey and the other lessees transferred rights under the 1975 Lease to a developer, Malouf Abraham Company. The transferee is thus an entity that not only participated in, but was by the terms of the 1975 Lease *responsible for* starting and continuing oil and gas production on the property. This too makes section 541(b)(4)(B) inapplicable.

Finally, the statute requires the Poiveys to show that "but for" the operation of the statute, their estate could only include the Mineral Rights by virtue of section 365 or section 542. The court has already explained why the estate's interest in the Mineral Rights does not depend on the trustee's assumption or rejection of the 1975 Lease as an executory contract and that same

---

[3] A "term overriding royalty" is defined as "an interest in liquid or gaseous hydrocarbons in place or to be produced from particular real property that entitles the owner thereof to a share of the production, or the value thereof, for a term limited by time, quantity, or value realized." 11 U.S.C. §101(56A).

analysis applies to section 541(b)(4)(B) as well. Section 542 allows the trustee to compel the turnover of property of the estate. Here, while the trustee has asked the court to order the debtors to turn over post-petition royalty checks to him as property of the estate, there is no contention that the inclusion of the Mineral Rights in the estate arises solely as a result of the trustee's turnover powers. Consequently, the Poiveys' alternate arguments invoking section 541(b)(4)(b) also fail them.

## CONCLUSION

Because neither section 541(b)(4)(A) nor (B) applies to exclude Denise Poivey's interest in the Mineral Rights from being part of the bankruptcy estate, the Mineral Rights are property of the Poiveys' bankruptcy estate. In so ruling, the court makes no findings or rulings related to the Poiveys' exemption claims or the trustee's challenge to those claims.

Dated January 24, 2018,

_____
Brett H. Ludwig
United States Bankruptcy Judge